# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50424

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2016

Lyle W. Cayce
Clerk

RYAN DAVID ZIMMERMAN,

Plaintiff - Appellant

v.

GARY CUTLER; CURTIS JACKSON; CORPORAL MOLANDES; TINA HENRY; CONSTANCE NEWBERRY; PRESTON DODSON; RUSTY DOHERTY; LEWIS GARCIA; JAMES HENRY; MICHAEL KLOSS; DUSTIN OLIVER; JACOB WARDLOW; LEE HARRIS; HOWARD E. WILLIAMS,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:14-CV-203

Before DENNIS, ELROD, and GRAVES, Circuit Judges.

PER CURIAM:*

Ryan Zimmerman appeals from the grant of summary judgment dismissing his 42 U.S.C. § 1983 suit. Zimmerman's claims arise from an on-the-street police encounter in which he was subjected to an electric shock from a Taser and subsequently transported to jail. Specifically, in February 2012,

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Zimmerman attempted to flee on foot from Defendant-Appellee Officer Lee Harris, and Harris, suspecting Zimmerman of having committed a misdemeanor, deployed his Taser. The resulting shock caused Zimmerman to fall to the ground and fracture his arm. Harris transported Zimmerman to the county jail, where a medic treated the abrasions on Zimmerman's arm, but the fracture was not detected at the time. Zimmerman brought this suit against multiple defendants, alleging claims of unlawful arrest, excessive force, deliberate indifference, and failure to train. For the reasons described below, we affirm the district court's summary judgment in favor of the defendants.

## BACKGROUND

Plaintiff-Appellant Ryan Zimmerman spent the evening of February 14, 2012, meeting with friends at bars near his apartment in San Marcos, Texas. At around two o'clock in the morning, Zimmerman and his roommate noticed that a show was ending at a nearby music venue and decided to walk over. Zimmerman's roommate went inside the venue to find a friend while Zimmerman waited outside. Among the people exiting the theater, Zimmerman noticed a man with whom he had previously had a verbal dispute. Upon seeing each other, Zimmerman and this man resumed their earlier disagreement and began trading insults. Zimmerman walked alongside the man down the sidewalk as he and the man insulted and cursed one another. As they entered a crosswalk and began to walk across an intersection, the man stopped and turned to face Zimmerman. At that point, according to Zimmerman, the argument got "more heated," becoming an intense "standoff." Neither man, however, raised a hand against the other.

A few seconds after the two men stopped in the middle of the street to face each other, a car pulled up, which Zimmerman quickly realized was a police car. Upon seeing the police car, Zimmerman turned and ran back toward

2

the theater. Officer Lee Harris, of the San Marcos Police Department, exited his squad car and gave chase. As Zimmerman neared an alleyway next to the theater, he was struck in the back by a single shot from Harris's Taser and fell to the ground. When a second officer asked Zimmerman why he fled, Zimmerman responded that it was because he did not wish to talk to the officer. Zimmerman was handcuffed and placed in Harris's squad car.

Harris next drove Zimmerman to the Hays County Jail. During the car ride, Zimmerman was extremely angry and complained that the handcuffs hurt his wrists. By the time Harris accompanied Zimmerman into the jail, the tension between the two had dissipated and they had established a jocular rapport.

Upon intake, Zimmerman was asked about his medical conditions and indicated that he had high blood pressure, had previously had four knee surgeries, and had lacerations on his right elbow and right hand. The cuts on Zimmerman's arm were from falling on the ground after he was shot with the Taser, and were not particularly deep. A medic at the jail cleaned and applied a bandage to the cuts on Zimmerman's arm. While his arm was being cleaned, Zimmerman mentioned that it was "in pretty bad shape." He testified that he may also have said, "I hope my arm is not broken." Once Zimmerman's arm was bandaged, Harris left and Zimmerman was placed in a cell. Zimmerman did not request additional medical attention. Zimmerman was later taken to arraignment, during which time he clutched his arm to his side because it was causing him pain. Zimmerman was finally released at around eleven o'clock in the morning. A couple of hours after being released, Zimmerman went to the emergency room and X-rays revealed that he had fractured his radius—one of the two major bones in the forearm. Zimmerman was referred to an

3

orthopedic specialist who gave Zimmerman a splint for his arm and told him to wear it for three or four weeks.

Zimmerman eventually pleaded "no contest" to charges of disorderly conduct and public intoxication in exchange for dismissal of the evading arrest charge and received three months of deferred disposition probation.

In 2014, Zimmerman filed the underlying complaint in Texas state court. Zimmerman brought claims against: (1) Harris for unlawful arrest, excessive force, and deliberate indifference to serious medical needs; (2) Howard Williams, the Chief of Police of the San Marcos Police Department, for failure to train his officers not to arrest persons suspected of Class C misdemeanors and not to use excessive force; (3) Gary Cutler, the Sheriff of Hays County, for failure to train his deputies and jailers that prisoners have a right to medical care and that deliberate indifference to a prisoner's injury violates the prisoner's rights; and (4) sixteen individual Hays County Sheriff's Office employees for deliberate indifference to a serious medical need. The defendants removed the case to federal court. The district court subsequently granted Zimmerman's motion to dismiss four of the individual Sheriff's Office employees. The remaining defendants next moved for summary judgment on all claims. The district court granted their motions, and Zimmerman timely appealed. On appeal, Zimmerman challenges the grant of summary judgment as to all claims, with the exception of the failure-to-train claim against Cutler, the Sheriff of Hays County.

## STANDARD OF REVIEW

We review a district court's summary judgment decision de novo. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When

4

reviewing a summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In addressing the defense of qualified immunity at summary judgment, courts conduct a two-pronged inquiry. *See id.* at 1865; *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Tolan*, 134 S. Ct. at 1865 (alterations omitted) (quoting *Saucier*, 533 U.S. at 201). "The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). A court has discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S. Ct. at 1866.

## DISCUSSION

### I. Unlawful Arrest by Harris

Zimmerman alleges that Harris violated his Fourteenth Amendment rights by arresting him without probable cause and by arresting him and requiring him to post bond for a Class C misdemeanor. For the reasons assigned hereinafter, we conclude that the district court properly granted summary judgment in Harris's favor on Zimmerman's unlawful arrest claim.

### A. Probable Cause to Arrest for Evading Arrest or Detention

Zimmerman was arrested for Evading Arrest or Detention. *See* TEX. PENAL CODE § 38.04. "For warrantless arrests, the test for whether the 'police

5

officer had probable cause to arrest is if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994) (alterations omitted) (quoting *Duckett v. City of Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992)). "Even law enforcement officials who reasonably but *mistakenly* conclude that probable cause is present are entitled to immunity." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004) (emphasis in original) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)).

A person violates Texas's evading detention statute "if he intentionally flees from a person he knows is a peace officer . . . attempting lawfully to arrest or detain him." TEX. PENAL CODE § 38.04(a). A person cannot be convicted of evading detention unless an officer had reasonable suspicion or probable cause to detain the suspect for a crime other than evading that arrest. *See Jenkins v. State*, 454 S.W.3d 712, 714-15 (Tex. App. 2015). Zimmerman does not deny that he intentionally fled from a police officer, but argues that Harris was not "lawfully" attempting to arrest or detain him. Harris responds that he had reasonable suspicion to detain Zimmerman to investigate potential charges of disorderly conduct, obstruction of a highway or other passageway, and public intoxication.

"Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (citations omitted) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In Texas, a person commits the offense of disorderly conduct if he, inter alia, "abuses or threatens a person in a public

6

place in an obviously offensive manner" or "fights with another in a public place." TEX. PENAL CODE § 42.01(a)(4), (a)(6). The offense of obstructing a highway or other passageway can be committed by "intentionally, knowingly, or recklessly" obstructing a highway, street, or sidewalk. TEX. PENAL CODE § 42.03(a)(1). The Texas public intoxication statute is violated if a person "appears in a public place while intoxicated to the degree that the person may endanger [himself] or another." TEX. PENAL CODE § 49.02(a). Public intoxication and disorderly conduct, when committed as described here, are Class C misdemeanors. *See* TEX. PENAL CODE §§ 42.01(d), 49.02(c). Obstructing a highway is a Class B misdemeanor. TEX. PENAL CODE § 42.03(c).

Here, Zimmerman testified that he had consumed five or six alcoholic beverages over the course of the evening in question, and that he and another man stopped to face each other in the middle of a street, engaged in a heated "standoff" that did not come to blows. Viewing the facts in the light most favorable to Zimmerman, the evidence shows that Harris saw Zimmerman and another man facing each other in a confrontational manner in the middle of the street for several seconds. Even while drawing permissible inferences in Zimmerman's favor, the evidence supports a conclusion that Harris reasonably suspected Zimmerman of criminal activity—disorderly conduct or obstructing a passageway. Under these circumstances, Harris had the authority to make an investigatory stop. Further, Zimmerman testified he fled once he saw Harris's vehicle. Because Harris's reasonable suspicion of criminal activity supported a lawful stop, Zimmerman's flight together with the altercation witnessed by Harris was an objectively reasonable basis for Harris to believe he had probable cause to arrest Zimmerman for evading detention. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("unprovoked flight upon noticing the police" was one factor among the totality of circumstances supporting

7

reasonable suspicion of criminal activity); *United States v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995) ("[I]n combination with other facts and circumstances, flight from an officer may create probable cause where the defendant persistently attempts to evade capture.").

## B.    Arrest for a Class C Misdemeanor

Zimmerman also claims that his Fourteenth Amendment due process rights were violated when he was arrested and required to post bond for a Class C misdemeanor.[1] Zimmerman's unlawful arrest claim must be analyzed under the Fourth Amendment, not the Fourteenth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (applying Fourth Amendment to excessive force claim). The Supreme Court has made clear that a citizen's Fourth Amendment rights are not violated when he is lawfully arrested on a non-jailable offense. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Moreover, we have held that "requiring a defendant charged with a non-jailable offense to post bond insures that he will appear for trial" and does not violate the defendant's constitutional rights. *Gladden v. Roach*, 864 F.2d 1196, 1200 (5th Cir. 1989). We therefore find Zimmerman's unlawful arrest claim without merit.

## II.   Excessive Force by Harris

Zimmerman next alleges that Officer Harris violated his Fourth Amendment rights by exercising excessive force in carrying out Zimmerman's arrest. Harris is entitled to qualified immunity on the excessive force claim only if, viewing the evidence in the light most favorable to Zimmerman and

---

[1] Zimmerman was, in fact, arrested for a Class A misdemeanor, Evading Arrest or Detention, and not the Class C misdemeanors of which he was suspected.

drawing reasonable inferences therefrom in his favor, Zimmerman has failed to raise a dispute of material fact as to: (1) whether Harris violated Zimmerman's constitutional right not to be subjected to excessive force; or (2) whether such right was clearly established at the time of the challenged conduct. *See Tolan*, 134 S. Ct. at 1865-66.

The parties, like the district court, focus on the second prong of the qualified immunity analysis—whether it was "clearly established" in February 2012 that deploying a Taser to stop a person reasonably suspected of a misdemeanor violated the Fourth Amendment. A right is "clearly established" if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Zimmerman acknowledges that we have not previously been presented with a closely analogous set of facts, but maintains that existing precedent placed the constitutional question beyond debate. Zimmerman is mistaken; he points to no case, and we have uncovered none, making clear to a reasonable officer in 2012 that the one-time use of a Taser on a person reasonably suspected of a misdemeanor amounts to excessive force.

Zimmerman relies heavily on two cases from other circuits to support his position, but neither involved the one-time application of a Taser to an actively-fleeing or actively-resisting suspect. In *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015), the Sixth Circuit denied qualified immunity to police officers who had entered the plaintiff's home, where they gratuitously and repeatedly applied a Taser after all resistance had ceased. In *Brown v. City of Golden Valley*, 574 F.3d 491, 494 (8th Cir. 2009), a police officer used a Taser on the plaintiff because she had disobeyed two orders to end her call with a 911 operator while sitting in the passenger seat of a car the officers had pulled over.

9

The Eighth Circuit affirmed the denial of summary judgment based on qualified immunity. *Id.* at 501. In both cases, the courts denied qualified immunity largely because the defendant officers had used Tasers on plaintiffs who were neither fleeing nor actively resisting arrest. *See id.* at 499; *Goodwin*, 781 F.3d at 324. The relevant facts of the instant case sharply contrast with the key facts in *Goodwin* and *Golden Valley*. Here, Harris reasonably suspected Zimmerman of committing several offenses and reasonably concluded that Zimmerman was fleeing to avoid an investigatory stop by Harris. Moreover, Zimmerman was on a public street and received only a single shock from Harris's Taser. Neither *Golden Valley* nor *Goodwin* is precedent that tends to clearly establish that Harris's conduct was unlawful.

Zimmerman correctly notes that a constitutional violation can be "clearly established" even when there is no materially similar precedent. *See Hope*, 536 U.S. at 741. He does not, however, argue that this case involves the kind of extreme or egregious conduct that has been held to be a clearly established violation of a more general constitutional right. *See, e.g.*, *id.* at 738 (officials handcuffed prisoner to hitching post for seven hours in the mid-day heat); *Cole v. Carson*, 802 F.3d 752, 773-74 (5th Cir. 2015) (officer intentionally fabricated evidence to frame plaintiffs for a felony they did not commit); *Wilkerson v. Goodwin*, 774 F.3d 845, 858 (5th Cir. 2014) (officials held plaintiff in solitary confinement for nearly forty years). Moreover, there is factually analogous caselaw that would undercut such an argument.

For example, in *McKenney v. Harrison*, 635 F.3d 354 (8th Cir. 2011), the Eighth Circuit affirmed qualified immunity for an officer who had deployed a Taser on a fleeing misdemeanant, even though use of the Taser had led to the suspect's death. There, two officers entered James Barnes's grandfather's possibly abandoned house to execute misdemeanor warrants for Barnes's

10

arrest. *Id.* at 356-57. When the officers found Barnes in a second-story bedroom, Barnes lunged toward a window to make an escape. *Id.* at 357. One of the officers shot him once with her Taser before Barnes reached the window, but Barnes continued through the window and onto the roof of the story below, from which he fell to his death. *Id.* at 357-58. Because one effect of a Taser shot is to paralyze large muscles, Barnes's incapacitation may have contributed to his lethal fall. The court ruled that "[w]hen Barnes made a sudden movement toward the window, which the officers reasonably interpreted as an active attempt to evade arrest by flight, the officers were entitled to use force to prevent Barnes's escape and effect the arrest." *Id.* at 360. The court acknowledged that the charges against Barnes were "limited to misdemeanors," but stated that the officers "were not required to let Barnes run free." *Id.* In concluding that the officer's actions were reasonable, the court stressed that the Taser was deployed only once and noted that "[t]he alternative of attempting to subdue Barnes by tackling him posed a risk to the safety of the officer and did not ensure a successful arrest." *Id.* Some of the facts that the Eighth Circuit found most compelling in affirming qualified immunity are present in this case.

Similarly, the Sixth Circuit held in an unpublished opinion written around the same time of the events at issue that "a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command," did not have a clearly established right not to be shot with a Taser. *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012). In *Cockrell*, an officer witnessed the plaintiff jaywalk and then run away when the officer approached. *Id.* at 491-92. Without issuing a warning or an order to halt, the officer deployed a Taser, causing the plaintiff "to crash headlong into the pavement." *Id.* at 492. The court summarized: "in no case

11

where courts denied qualified immunity was the plaintiff fleeing, and in at least some of these cases, the court specifically referred to the fact of non-flight." *Id.* at 496-97 (collecting authorities).[2] The court therefore held that not every reasonable officer would have understood that using a Taser on a non-violent, fleeing misdemeanant violated the Fourth Amendment. *Id.* at 498.

Like the officers in *McKenney* and *Cockrell*, Harris used a single Taser shot to stop a fleeing person reasonably suspected of a misdemeanor. Although the crimes Zimmerman was suspected of committing were relatively minor, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (listing as one factor in the excessive force analysis "whether [the suspect] is . . . attempting to evade arrest by flight"); *see also McKenney*, 635 F.3d at 360 (stating that officers were not required to let a fleeing misdemeanant escape). We conclude that at the time of Zimmerman's arrest it was not clearly established (so as to give Harris notice) that a single shot or use of a Taser to halt a fleeing misdemeanor suspect would amount to excessive force.

## III. Deliberate Indifference by Harris

Zimmerman briefly argues that Harris violated his constitutional rights by displaying deliberate indifference to Zimmerman's serious medical needs.[3]

---

[2] Though the events at issue in *Cockrell* occurred in 2008, the court cited cases published as late as November 2011 in support of its conclusion. 468 F. App'x at 495-96.

[3] Zimmerman's complaint states that his deliberate indifference claim against Harris arises under the Eighth Amendment. As the district court pointed out, Zimmerman's claim arises under the Fourteenth Amendment, as he was a pretrial detainee, not a convicted prisoner, at the time of the relevant events. *See Kitchen v. Dallas Cty.*, 759 F.3d 468, 477 (5th Cir. 2014) ("[T]he constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment."

12

In this circuit, a constitutional claim by a pretrial detainee arising from a one-time denial of medical care is governed "by a standard of subjective deliberate indifference as enunciated by the Supreme Court in *Farmer* [*v. Brennan*, 511 U.S. 825 (1994)]." *Hare*, 74 F.3d at 643. To prove deliberate indifference, Zimmerman must demonstrate that he was exposed to an objectively "substantial risk of serious harm" and that Harris "was actually aware of the risk, yet consciously disregarded it." *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002).

Zimmerman contends that Harris knew Zimmerman was exposed to a substantial risk of serious harm because Harris saw that Zimmerman's arm was scratched and bleeding, and because Zimmerman told Harris his arm hurt. Assuming arguendo that Zimmerman has presented sufficient evidence that Harris could have inferred a substantial risk of serious harm, Zimmerman's claim would still fail because he has offered no evidence that Harris was "actually aware of the risk" of substantial harm and "consciously disregarded it." *See id.* The fracture in Zimmerman's arm was not obvious. His only obvious injuries were the scratches on his arm, for which he received prompt medical attention. Even when crediting all of Zimmerman's evidence and drawing all reasonable inferences in his favor, no reasonable jury could conclude that Harris displayed deliberate indifference to Zimmerman's serious medical needs. Summary judgment was therefore appropriate.

## IV. Failure to Train by Police Chief Williams

Zimmerman also argues that the district court erred in granting summary judgment on his claim that Howard Williams, in his capacity as Chief of Police of the City of San Marcos Police Department (the

---

(alteration omitted) (quoting *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc))).

13

"Department"), is liable for failing to train his officers not to shoot a Taser at a fleeing misdemeanor suspect and not to arrest persons suspected of committing a Class C misdemeanor. Zimmerman makes clear on appeal that his claim against Chief Williams is a claim against the municipality and is governed by *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).[4] To succeed on his *Monell* claim, Zimmerman would have to show that the Department's training practices caused a violation of his constitutional rights. *See Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996). Specifically, he would need to demonstrate that (1) the training conducted by the municipality's policymaker was inadequate, (2) the municipality's policymaker was deliberately indifferent in adopting the training policy, and (3) the inadequate training policy directly caused a violation of Zimmerman's constitutional rights. *See id.*

Zimmerman argues that summary judgment was erroneously granted because the chief of the Department endorsed Harris's conduct in an affidavit. However, it is Zimmerman's burden to produce evidence concerning the inadequacy of officer training that could support a jury verdict in his favor. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989); *Anderson*, 477 U.S. at 256. Zimmerman has failed to adduce any evidence of Department training procedures—inadequate or otherwise—and thus fails to carry this burden. *See City of Canton*, 489 U.S. at 391. Further, because Zimmerman has not offered sufficient evidence of a constitutional violation by Harris, he also cannot satisfy the causation requirement of a failure-to-train claim as it pertains to his allegedly unlawful arrest. *See Hill v. Carroll Cty.*, 587 F.3d 230, 238 (5th Cir. 2009) (declining to give *Monell* claim further consideration where plaintiff had

---

[4] Zimmerman has thus abandoned any claim against Chief Williams in his individual capacity.

not created a genuine issue of material fact on the existence of a constitutional violation).  Thus, summary judgment was properly granted.

## V.    Deliberate Indifference by Hays County Deputies

Finally, Zimmerman contends that the district court erred in granting summary judgment in favor of the individual defendant deputies of the Hays County jail on his claim that these defendants were deliberately indifferent to his arm injury.  To survive summary judgment on these deliberate indifference claims, Zimmerman must demonstrate a genuine issue of material fact as to whether each deputy was actually aware of a risk of serious harm and consciously disregarded it.  *Lawson*, 286 F.3d at 262.  As Zimmerman has presented no evidence of any of the individual deputies' knowledge, actions, or omissions, a reasonable factfinder would have no basis to conclude that any of the individual Hays County defendants were aware that Zimmerman could suffer serious harm.  Zimmerman thus cannot show that the Hays County defendants exhibited deliberate indifference, and the district court properly granted summary judgment in favor of these defendants.  *See id.* ("The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it." (citing *Farmer*, 511 U.S. at 837, 839)).

## CONCLUSION

For the reasons described above, we AFFIRM the district court's grant of summary judgment for the defendants on all of Zimmerman's claims.

15